(18 App. Div. 41.)

## MILES v. KING et al.

(Supreme Court, Appellate Division, Second Department. May 11, 1897.)

INJURIES TO PASSENGER—NEGLIGENCE—QUESTION FOR JURY.

While defendant's train, on which plaintiff was a passenger, was entering a station, and after it had either stopped or nearly stopped, it gave a sudden jerk, and threw plaintiff against a seat. *Held,* that it was a question of fact whether the train was negligently operated, and therefore the case should have been submitted to the jury.

Appeal from trial term, Kings county.

Action by May Isabel Miles against John King and another, as receivers of the New York, Lake Erie & Western Railroad Company, for personal injuries. The complaint was dismissed, and plaintiff appeals. Reversed.

Argued before CULLEN, BARTLETT, HATCH, and BRADLEY, JJ.

Lemuel Skidmore, for appellant.

F. B. Jennings, for respondents.

HATCH, J. We must assume that the plaintiff received her injury by reason of the sudden and violent jerk of the car. The question presented, therefore, is, were the defendants guilty of negligence in producing this sudden movement of the train? The court at the trial held, as matter of law, that negligence of the defendants was not established, and dismissed the plaintiff's complaint at the close of the proof. While the evidence upon some of the main points in the case was meager, somewhat obscure, and conflicting, we think, upon the whole, that it was sufficient to carry the case to the jury, and that it was error in the court in assuming to determine the question as one of law. The facts of the case were these: The plaintiff, a girl of 20, was traveling, in the charge of her parents, and in company with other members of her family, from Chicago to Jersey City, over the railroad operated by the defendants. As the train upon which plaintiff was a passenger was approaching Salamanca, a station upon the defendants' road in the state of New York, notice was given by some person engaged in the operation of the train that the car in which plaintiff was then riding would be taken out at Salamanca, and all passengers traveling beyond that point were requested to move into another car. Upon the request being made to remove from the car, the plaintiff and her mother immediately arose and passed into another car, in the rear of the one they were in, where plaintiff procured a seat next the aisle of the car, that part of the seat nearest the window being occupied by another lady. The train at this time was in motion, running into the station at Salamanca. As the train came

into the station, the lady with whom plaintiff was sitting arose to leave the car for the purpose of alighting at the station. She was quite a large person, and plaintiff stepped into the aisle to allow her to pass out. The plaintiff stood with her leg in contact with the seat from which she had arisen, when there came a sudden and violent jerk of the car, which produced a fracture of the plaintiff's leg. Whether the train was in motion at the time when the plaintiff arose from her seat to permit its other occupant to pass out, is a mooted question; it being insisted by the counsel for the defendants that the train had not stopped, but was still in motion, and by the plaintiff that it was at a standstill, when the plaintiff arose. This question therefore requires an examination of the testimony. The father of plaintiff testified that he was in the smoking car when a notice was given that a car would be cut out of the train at Salamanca; that he then arose from his seat, and started back to assist his family if they needed assistance. When he reached the car in which they had been riding, he saw his son and two ladies pass out at the other end of the car, and, to get ahead of them, he alighted from the car at its forward end, and ran to the other end. At this time all of the passengers were practically out of the car, and to the best of his recollection the train was stopped at that time. On cross-examination he was asked:

"Why did not you go back to that car, instead of jumping off? A. The seats were empty, but there were three or four persons passing out through the other door. I thought I would make quicker time by jumping off and going around. I don't know whether the car had stopped at that time or not. I have no recollection about that. But the passengers were all out, with the exception of these two ladies. They would not have gone out unless it had stopped. The Salamanca passengers, I am speaking of. They were all out except these two. I have no recollection of whether the train had actually stopped or not, except for my own actions and the appearance of things. It might have been on the point of stopping, or I should not have jumped off. I did not notice anything unusual about the stopping of the train."

When this witness reached and entered the car where plaintiff then was, the injury had occurred. It is quite evident that when the father alighted from the car the train was either stopped, or nearly so. No jerk of the car had then occurred which the father noticed, and as he alighted, and other passengers were alighting, it would not be an unreasonable inference to suppose that the train had then stopped, and that the jerk which inflicted the injury occurred during the time the father was passing from one end of the car to the other upon the platform of the station. The mother testified that, when she entered the car where the injury occurred, her son and other daughter were in the last seat in the rear; that she found the seat occupied by the lady, and directed plaintiff to sit there till the train stopped. The mother passed three seats to the rear of the one where plaintiff stopped. As she passed to her seat there came a jolt of the car which threw her into the seat. Immediately she heard the plaintiff scream, and went to her. The train had then stopped. This witness does not say when the train stopped in fact. But it is clear that when she went to take

her seat the lady seated with the plaintiff had made no request to pass out, and as the train was stopped in the time that she passed the plaintiff to take her seat, and the time of the outcry by the plaintiff, and between these times the lady arose to pass out of the car, it might be inferred that the train stopped before the jerk came. Certainly the motion of the train at that time must have been very slow, if it moved at all. The plaintiff testified that, after her mother went further back to find a seat, the lady asked to be allowed to pass, and she then stood up in the aisle for that purpose, and while in that attitude the jerk came. She was not asked, nor did she state, whether the car was still before the jerk came. Plaintiff's sister testified that there was a violent jerk just before she heard plaintiff scream. "I cannot tell whether the train had stopped at the time I heard my sister scream. I think it had. I am quite sure it had, in fact. * * * I cannot be positive about it." Winters, a witness called by the defendants, testified that the train "had not stopped when this lady stood up. It was slowing up to come into Salamanca. * * * I guess it was about stopped when this young lady cried out." On cross-examination: "Q. Mr. Winters, you say you saw this young lady stand up, and a woman in the seat to go past her, and you heard her scream, did you? A. Yes, sir. * * * When I said that the train had stopped when she screamed, I meant what I said." John McNally, called by the defendants, testified that the lady seated with the plaintiff "got up in a kind of bluster, and rushed out of the car. * * * When the accident occurred the train was west of the station. It had begun to slow up. The train stopped after the accident. The girl was hurt before the train stopped. If the train started up again after it stopped there, I didn't notice it. I ran out of the train." On cross-examination he was asked about the lady who left the car: "Q. At the time she went out, had the car stopped? A. The car was stopped. I did not follow her, but don't suppose she jumped off the car in motion; just started to go out before the car stopped. * * * She started to go just as soon as she got up, and the train had stopped at that time." On redirect examination he was asked: "Q. Do you know whether the train had stopped at the time of the accident or not? A. It had not stopped."

There was other testimony offered by the defendants to the effect that the train was in motion at the time of the accident, and that the accident happened, not on account of a jerk of the car, which these witnesses say did not take place, but by reason of the large lady pressing against the person of the plaintiff. It is seen from the quoted testimony that, so far as direct evidence goes, it is not clear that at the time of the accident, and when the jerk came, the train was at a standstill. The witnesses are not agreed upon that subject, and in at least one instance, as we have seen, a witness for the defendants is not agreed with himself upon that point. However, the witnesses relate the succession of events leading up to the accident, the actions of the other passengers and the circumstances attendant upon the management of the train

at the time of the sudden jerk of the train; and upon this testimony we are of opinion that it was a question for the jury to determine whether the train was at a standstill before the jerk came. If so, the negligence of the defendants was established. If they assumed to move it thereafter, so as to jeopardize the person of the passenger, they did so at their peril. Although we conclude that the evidence warranted a finding by the jury that the train was still when the movement was made which caused the injury, we do not think that such fact was absolutely essential to the maintenance of this action. It is clear that the jury would be authorized to find that the train was slowed down very nearly to the point of stopping; was at the time opposite the platform of the station where passengers were expected to alight, and where they did alight. Under such circumstances, the defendants were bound to take notice of the fact that passengers intending to leave the train at that station would be engaged in preparation, and that they might be upon their feet for that purpose. Notice had already been given which required the passengers to vacate one car, and the defendants had actual notice that this requirement was being observed by the passengers, and that they were upon their feet for that purpose. Under such circumstances, the jury would be authorized to find that it was negligence to suddenly, and without warning, jerk the train so violently as to throw the passengers into the seats. The usual result flowing from such an act would cause a person to lose his balance, and bring him, with more or less violence,—dependent upon his position and the violence of the jerk,—in contact with the seats of the car. Injury in this manner and from this cause has frequently happened, and the courts have held the act sufficient upon which to predicate negligence. Wylde v. Railroad Co., 53 N. Y. 156; Newton v. Railroad Co., 80 Hun, 491, 3 N. Y. Supp. 488; Bartholomew v. Railroad Co., 102 N. Y. 716, 7 N. E. 623; Colwell v. Railway Co., 57 Hun, 452, 10 N. Y. Supp. 636. We are sensible that in the operation of railroad trains there must be more or less of jarring, jerking, and sudden movements of the train, which are a necessary concomitant to their operation at all, and for which no right of action lies, even though injury results. What movements of trains are necessary and what are unnecessary may be, at times, difficult of determination, and must rest for solution upon the facts of the particular case. In the present instance we are not able to see that the management of this train, under the circumstances, was so far necessary, or such as might reasonably be expected, as to make its solution a question of law for the court. On the contrary, we think it became a question of fact for the jury, and should have been left to them. The objection that no proof exists to show that the injury was inflicted by the servants of the defendants, or upon a road controlled and operated by them, is sufficiently answered by the authority of the Wylde Case, supra.

The judgment should be reversed, and a new trial granted; costs to abide the event. All concur.